Case number 14-2075, Cora Mitchell v. City of Warren, Michigan et al. Oral argument is not to exceed 15 minutes per side. Mr. Burton for the appellant. Thank you. Thank you, Your Honors. Good morning. I'm John Burton. I represent Cora Mitchell, who is the mother of Robert Mitchell, Robert at age 16. This happened in 2008. He was struck with two half-inch taser darts right over his heart, bracketing his heart. He weighed 128 pounds at the time. He immediately collapsed and was found by paramedics to be in ventricular fibrillation. That's a medical term that is throughout the case. That's the irregular heart arrhythmia that's invariably fatal unless it's reversed. And it has many causes, but one of its causes is the electrical disruption of the normal heart rhythm. The taser was fired by Warren Police Officer Jesse Lapham in the manner in which he had been trained to fire, which was to aim at center mass. Now I'd like to step back as to how Officer Lapham found himself in that situation. Taser has been marketing the device since it was invented in 2003. It's a relatively new device in that sense, or at least was at that time. That's the X26? The X26, which has a waveform that is quite distinct from its predecessor, which is the M26. The M26 is itself relatively new. It was invented and first put on the market right around the year 2000. Prior to that, since its invention in the mid-'70s, there had been devices that were called tasers. They were much less powerful electrically. The marketing of Taser International was this second generation device that had four times or six times the stopping power of its previous devices. And the X26, to achieve a very sleek, lightweight, effective design, actually lengthened the waveform so it was much longer in terms of each of the pulses. These are still incredibly short. They're measured in microseconds, 150 microseconds is the length, but it's still much longer than any of its previous devices. And it was put on the market with very little testing. There were a lot of questions raised about its safety, a lot of anecdotal information about whether it could cause cardiac arrest. And then in September of 2005, a report was published in the New England Journal of Medicine, probably the preeminent medical journal in the United States, saying that a 14-year-old boy in Chicago had been hit in the chest, had immediately had ventricular fibrillation, and that officers who use this device should consider carrying automatic external defibrillators so they could deal with this situation in the future. But as to that incident, we don't have a lot of other information, right? Actually, there's quite a bit of information. Dr. Zipes, who is probably the preeminent electrophysiologist in the United States and who was the plaintiff's expert in this case, looked at that case very closely. The report in the journal is sparse. But Taser went down and investigated. There actually was a lawsuit. The paramedic who was present when this happened was deposed. We have the medical records. It shows that within two minutes of this young man being hit in the chest, because the paramedics were already there, he actually had a cut on his arm. They witnessed his collapse. They got him onto a heart monitor and within two minutes saw the ventricular fibrillation. They were able to give the defibrillating shocks, and fortunately the young man survived and was able to resolve a lawsuit that was filed on his behalf against the Chicago Police Department. So quite a bit is known, quite a bit that Taser has published and represented about this incident as false, demonstrably so. But it was noticed that this problem existed. What Taser then did... For what it's worth, the way I was seeing the case was just the question of whether these two studies that come out a week before this sale, whether they suffice. That's how it's working in my mind. What they seem to show is there's definitely a possibility of this problem. Maybe you think they show more than that, but for now let's just assume possibility. So one question, one way of thinking about this is what's the threshold requirement in terms of evidence, scientific knowledge, in order to require warnings? Because you want to have to do this ex-ante. You can't look back on it and say, oh, well, now we know what happens and we know this happened in other incidents. We have to look at it from the perspective of that date of sale, at least under this Michigan statute. So wouldn't you say that's right? I mean, it showed a possibility of this problem. Absolutely, I believe Your Honor is correct. I was just about to mention those studies because one of the two studies was commissioned by Taser. It was a very prestigious Cleveland clinic, one of the leading medical institutions in the United States, and their lead electrophysiologist, Patrick Chu, designed the study. And in it, what he did, and it was very clever, he actually put a measuring electrode into the heart of the test animal, something that, of course, could never be done with a human. I don't understand studies. I'm just trying to get you to, what's the case that says when there's a possibility of something, and the best you get is one of the studies, one out of 150 times, there actually being a fatality in this animal. So I guess your position, obviously, is that's enough. And just help me understand why that's so. Because, I mean, there are cases that say, well, this study suggests a problem, but you don't just after the first study suddenly require warnings or say that establishes negligence. Often you require a little more study. What one study does is require you to look further, and that's what I'm trying to figure out with this case. Well, I think your Honor is not correctly interpreting the study with the court's permission. What the study determined was not one out of 150 times, but every time. Cardiac capture. Every time it caused cardiac capture when the darts had a certain position. And cardiac capture can cause cardiac arrest. Now, it did in one of the pigs in Dr. Nathakumar's study. It's not a suit for damages from cardiac capture. It is, because cardiac capture is what triggered the cardiac arrest. You have a situation, your Honor, where there is a regular sinus heartbeat. Then this electrical current, which is an alien current, alien to the body. The pacemakers are cardiac capture. Pacemakers are therapeutic devices that are timed to regulate the heartbeat. I'm just saying that, well, just correct my ignorance here, but I'm just saying that as a way of saying the concept of cardiac capture in the abstract has a lot of possible meanings. It does lots of things, and the question is when it leads to deaths. The question is not cardiac capture in the abstract. The question is when an external power source comes in at a rate that's equivalent to 1140 beats a minute, because it's 19 times a second, and interjects pulses into a heart that is not supposed to have pulses there. That can disrupt the heart's normal rhythm and trigger fibrillation. It does not do it every time, but it does do that, especially in a heart that may have some preexisting pathology, which this heart may have. That's why when Dr. Chu got his capture data, he told Rick Smith, the CEO from TASER, across the table, just like I'm talking to you now, you need to look at chest avoidance because this is a threat. So the fact is, and then there were two studies. So the first TASER knew about... Before you get into that, because I think you're getting ready to talk about what I want you to talk about, because I want you to identify what is the record evidence existing that supports the contention that TASER had a duty to warn, and thus that there was a failure to warn either about the use of the TASER at center mass, or about the possibility that the TASER would result in this cardiac ventricular... Fibrillation. V-fib. V-fib. Okay, V-fib. That's where we go. VF. Okay. Capture can lead to VF. So here's another possibility. You're dealing in possibilities. It can, but it probably doesn't. Don't you have to... I don't agree, Your Honor. I don't agree that we're dealing in possibilities. What we're dealing with is increased risk. The example I used in the brief was drunk driving can lead to an accident. No one says that drunk driving is harmless because most of the time the drunk driver gets home without crashing. I see I'm out of time already. No, you can respond to his question. So we're talking about elevated risk, and an elevated risk that is very easily addressed by simply a warning, which they give now, and which they've given since five months after this death, to simply target the device other than at the heart and beware of this possibility, and minimize it because it doesn't happen if the darts hit anywhere else. That's what the PIG studies. There were two, Dr. Chu's and Dr. Nantha-Kumar's. Dr. Nantha-Kumar's was independent. It was published a month before the sale, but they knew about it long before. Wasn't Taser allowed to... Maybe you dispute this assessment of the evidence, but it seemed to me Taser was also allowed to factor in in thinking about these studies. First of all, they had to keep thinking about this, and I don't think there's any doubt they continued to think about it. But weren't they allowed to factor in that there were an awful lot of studies saying that chest shots were safe, and maybe just as importantly, you had hundreds of thousands of discharges up to that point. It's really only been recently where you start having these fatalities. They're just in a cost-benefit mode trying to figure this out. No one wants anyone to die. That's not good for the product. There's no suspicion here. It seems to me they were funding this study and trying to direct it one way or another. It seemed like it was good faith. Of course, the other study would prove that anyway. It was independently funded. So aren't they allowed to factor that in? You're the CEO. Are you supposed to just say, okay, we've got to change this? You're changing something for officers, which seems to me relevant. It's a lot easier to say, aim for the torso, which is a bigger target. Now when you say, but not the chest, you've shrunk the target a little bit. That has issues of its own, doesn't it? This is all designed to prevent fatalities. That's the whole supposed beauty of tasers. Well, it's being given to officers as a non-fatal weapon, and then when the officer kills somebody, they have to live with that, as Officer Lapham has. It's feasible to train not to shoot the chest because they have done that since September of 2009. In terms of your other point, the data is very poor on the number of people who have died. There is not reliable data. At the time the taser said there had been hundreds of thousands with no incidents, Amnesty International has printed over 500 reports of deaths. So the data is very poor. Amnesty International, what is that statistic from when to when? It's cited in our brief, and I think it's 2002 to 2008, 564 deaths. But we do have it cited in our brief. But no assessment of how and why and obviously all kinds of things going on. Well, it's very difficult to do when you don't look at an individual case, like we've looked at this one where a 16-year-old boy is sitting there. He gets hit in the chest and he's immediately. Okay, and I want to go back to the question that I posed before that I don't think you either answered or had an opportunity to answer, and that is, what is the record evidence that demonstrates or creates in your mind that the taser had a duty to warn at that time? Was it the report that they commissioned? Was it the journal information? What was it? It was the data from the two reports, Dr. Chu's and Dr. Nanta Kumar's, that said that when the darts are bracketing the heart, they do reliably cause cardiac capture, which can lead to ventricular fibrillation and sudden death, and that the risk of cardiac capture does not exist when the darts are not vectored over the chest. And I know my time is up, but could I refer to one last thing before I sit down, which I think is quite appropriate? And this is Turpin v. Merrill Dow, which says, because it's so right on point. Is that a Dow-Bear case? It's a Sixth Circuit case that has to do with the evidence of medical causation in a pharmaceutical case involving Benedictine birth defects. And it's a case that was relied on by a Michigan case that was relied on by Taser, saying animal testing should not be used for this purpose. And I think it just answers Judge Donald's question and your question, Judge Sutton. Quote, we do not mean to intimidate that animal studies lack scientific merit or power when it comes to predicting outcomes in humans. Animal studies often comprise the backbone of evidence indicating biological hazards. Counsel, we'll keep listening, but just so you know, none of us has asked questions along those lines. None of us is concerned about the fact that these were animal studies. I mean, animal studies, it's true, you've got to pay attention to the weight of the animal and you've got to pay attention to how you translate. But no one here is saying these should have been tested on humans. So I don't know what you're adding to the debate. I mean, keep going, but I'm just telling you, if you're making an animal versus human thing, I don't think any of us is not appreciating your point on that. And I think this goes to both what your honors are asking. The Taser received unambiguous, high-quality, independent two studies that said when you get this capture on the heart, it does cause cardiac capture, which can trigger cardiac arrest. And now, with that biohazard identified from this animal study, we're going to put this product in the market, continue it in the market, with instructions to shoot it at a chest and see whether human beings die. Be fair, it wasn't instructions to shoot at the chest, it was to shoot at high body mass, which covers the whole torso. But you're right to say that will lead to chest shots, so that's totally fair. But I don't think it's fair to say they taught people to aim to the chest. One of the witnesses said he was taught that. Center mass, right? Center mass. But I think this is another way of getting at Judge Donald's question. So let's say for the sake of argument that you're right, that a week before this sale, they had a reason to change the instructions on where to aim, given very high risks of cardiac capture. We won't even call it risk anymore. Cardiac capture is going to happen with chest shots. We'll say that's the way to think about this. Where's the study outside the second one, which has the 1 in 150 where there's a fatality? Where's the study that says, okay, cardiac capture is really terrible and often leads to fatalities for these reasons? Is that out there? Or is that, like, Judge Sutton, why are you asking for that? That's so obvious. I mean, just tell me. Is it really obvious? Is there some place that tells us that in 06 everyone knew cardiac capture was another way of saying a high percentage of people are going to die? I don't think a high percentage, significant percentage. And, yes, it's in the record because that's something that electrophysiologists know. That's something that Dr. Chu told Taser six months. We're not talking a few weeks. They were posted online a month before, but it was six months before that that this face-to-face meeting between Dr. Chu and the CEO at Taser happened. He said, we are getting capture, and that means that chest shots should be avoided because cardiac capture can trigger cardiac arrest in human beings, especially if they have a pathology. So just help me out. Are you just saying it's that conversation that is the medical evidence? And also, Dr. Zeib's medical report, this is well-known in electrophysiology. No one would question this in electrophysiology, and they don't put in any doctor that says, oh, if you've got a device that's pacing at 1140 beats a minute, that's not a threat to human life. It's so obvious it would not have a study. It wouldn't be necessary. Well, the pig study doesn't. I mean, it's 1 out of 150, and it's obviously a way lower weight. What happens is that the pulses are going at 1140 beats a minute. The capture is occurring at different intervals. So you get 1 to 3, 1 to 4, 1 to 2. But it's interjecting heartbeats where they don't belong, and that is what disrupts the rhythm, and that is what can and does on occasion and did on this occasion and killed the 16-year-old boy disrupt the heart rhythm. Well, I think we've let you go over, but that's because we had questions for you. So thank you for answering them. You'll get your full rebuttal, and we'll hear from your friend on the other side. Thank you very much. May it please the Court. Pam Peterson on behalf of the Appley Taser International. The district court here properly held that a theoretical risk is not sufficient to trigger a duty to warn under Michigan law, and independently that no causation exists as a matter of law. Well, if one of the studies has indicated that there's a possibility, doesn't that move it from a theoretical risk to an actual risk? You might say small, but that study moves that from theoretical to actual, doesn't it? No, Your Honor, I don't believe so. As I think detailed very clearly in the district court's decision, everything was talked about, some possibility this may do this, this may not do that. What about the conversation with the Taser CEO by the doctor when he says that at certain levels this happens? No, he didn't say at certain levels this happened. He says that there's some possibility, even though we did not achieve ventricular fibrillation in any pig for any exposure, because we got cardiac capture, there may be some possibility of this in humans that requires further investigation. So a manufacturer does not have a duty to warn about any possibility that may exist. That's not the statutory standard, which requires a material risk. So he says that it requires further exploration, further investigation. So then you just put it on the market and see what happens without anything? Well, we were on the market, and at this point in time, there were hundreds of thousands of ECD applications in the field with no reported causative incident from a Taser X26 to ventricular fibrillation in any human. The only thing that plaintiffs point to in the record whatsoever is a two-paragraph letter to the editor, which their own cardiac expert acknowledges only shows a temporal association between a field deployment and the resulting ventricular fibrillation in any human at any time before this date of sale in August of 2006. What about the journal articles? Well, the two studies, Your Honor, actually, they were very good for Taser, quite frankly. Taser commissioned the cocaine study, which was the Lacqueretti-Chu study. And in that, even though the darts were positioned in the most worst-case scenario, directly over the heart, they could not induce ventricular fibrillation in any pig during any exposure during that test. They found that it was unlikely that in normal use, a Taser X26 would induce a ventricular arrhythmia in a field-use situation, that it was unlikely. The key, I think, with that study, Your Honor, is that it actually established an eight-fold safety margin. This was really important, and that was all good news to Taser. I mean, what happened here was that, yes, they got cardiac capture at standard X26 exposures, but cardiac capture is simply a situation where you have an external device that captures the heart rhythm during the duration of the electricity. When the electricity stops, the capture ends, and it reverts back to normal sinus rhythm without any harm or any medical intervention needed whatsoever. So that's a catch-and-release kind of situation. That's all they got in the pigs. So this is what I want to ask you. Given everything that you've said and given these studies that you have pointed to, why aren't the very arguments that you're making indicative of the existence of a genuine issue of material fact, which would preclude summary judgment in this case? It seems to me that by virtue of the arguments and the record, you're actually identifying a genuine issue of material fact. I don't believe so, Your Honor, because, again, the statute, and this is really a matter of statutory interpretation. You go back to the statute, and the statute requires a material risk. By definition, a theoretical risk is not material. We have a situation where plaintiff's own expert has acknowledged that ventricular fibrillation is different than cardiac capture, that there is nothing that's inherently unsafe about cardiac capture in and of itself, and that just because a device causes cardiac capture does not mean that it also induces ventricular fibrillation. Why do you say it's theoretical? I mean, you had one pig die in one of these studies. Is that just because of the weight difference point? There are a lot of reasons, but certainly there was one pig one time, as Your Honor mentioned before, out of 150 exposures, and that is something that Dr. Zipes, plaintiff's expert, acknowledges is statistically insignificant, that's his deposition testimony, and that it only shows proof of concept. Maybe the thing I'm pushing back on is you keep saying theoretical, and it just seems to me if you're construing the record in favor of the plaintiff, you've got these statements about how cardiac capture is dangerous. It's dangerous. I mean, that's just not pure theory, and then they have a study where one pig does die, and it seems to me, reading the evidence in their favor, I would say at the time of this sale, it was a possibility that a chest shot could lead to V-fib. That seems like that's not theoretical. That's what I would call a possibility, and the question in this case is whether that's enough under Michigan law to go to a jury. No, Your Honor, it's not because it doesn't establish a material risk. Again, if you go back to the Lacqueretti 2 study, that study established an eight-fold safety margin. You have a situation where the researchers used a scalable device that they could ratchet up the power beyond the standard discharge that's used in the field, and they did that and had to use a multiple of eight times before they could ever get ventricular fibrillation in a pig half the size of Mr. Mitchell. Weight is a huge issue, and it's always been associated with the ventricular fibrillation threshold. In fact, you have Dr. Lacqueretti, who was the lead author of the study that plaintiffs rely on. He took his exact same pig data from 2006, and he converted it to account for the different weights of humans that are your typical suspects in the field, and for the different electrical structure of the heart and of the chest anatomy in humans versus pigs. And he published a study two months before Mr. Mitchell died, in which he says that when you make those conversions, the probability of inducing ventricular fibrillation from CEW chest shots is essentially zero for the weight of the typical arrest subject. And he said the theoretical possibility of an X26-induced VF does not appear to be a plausible explanation for arrest-related deaths. This is the same author of the study that they rely on. That is at page ID number 3873-74 in the record. So you have the authors of these studies who themselves say, you cannot equate this. This does not prove that there is a risk of ventricular fibrillation in humans. It just simply requires further study. To this day, there is only a single documented incident of cardiac capture from an X26 in any human being ever. Why did you change the warning? Or why did you change the teaching? It was because of risk management, Your Honor. Because there are significant lawsuits, this takes away the argument, basically, if an officer has the opportunity in a dynamic field situation to lower the shot, then he should obviously do that if that's a plausible situation. Did the events in Fontenot occur before the events in this case or after? The incident with Mr. Turner in the Fontenot case was March of 2008. Taser was not sued in that case until 2010. But I'm talking about the time of suit. I'm talking about the time of the event. So it occurred a year or so before. Yes. So that provided some notice to, even though they weren't sued, it provided some notice to Taser that there was an issue. All that it provided notice of was that it was a temporally related incident. Certainly, until you get into the details of that and there's litigation, and causation was hotly disputed in that case, you don't have a jury verdict until well after the incident at issue here. I think that the court did a nice job in laying – and I think we have to go back again to the statute. It requires a material risk. When you look at the definition of material risk in the Green case, it talks about an important or significant exposure to the chance of injury. That's talking about probabilities. That's not talking about possibilities. Anything is possible. And we have a statute at issue here from Michigan that's a tort reform statute from 1995. And it was intended in a very manufacturer-friendly state to protect manufacturers from these kinds of post-sale duty to warn and these types of theories. You have to anchor what the manufacturer should have known into the science that existed at the date of sale. That's very clear here. And at the date of sale, we have these two pig studies, which established a significant – in and of themselves established a significant ventricular fibrillation safety threshold. And so you don't think that that's the kind of information that a jury could hear and consider in making the ultimate decision in this case. My problem is it seems to me that jurors, juries, jurors, are perfectly capable of hearing the evidence and making a decision. That's what they do. I don't understand why you say that this is so clear that it's appropriate for summary judgment. That's my problem. Material risk wasn't established in pigs, let alone in humans. I mean, that's the problem. But, Your Honor, I would refer you to the Rodriguez v. Stryker Corporation decision that was out of this court, the Sixth Circuit, in 2012, where the decision says, and that's found at 680 F. 3rd. 568, juries do not determine whether and when a party presents sufficient evidence to create a tribal issue of fact. Trial and appellate courts must decide whether the inferences a party asks the jury to draw are too speculative to be reasonable. And the inferences here must be drawn in favor of the Mitchell estate. Where we have study authors who themselves have said, you can't extrapolate this to humans. And when you look at Dr. Chu's deposition testimony, when he specifically says, I don't know that you can get that capture rate in humans. I don't have any human data. We can't go there. But on the one hand, you're saying you can't extrapolate it to humans. But on the other hand, you're saying because it did something in animals, then that should really support our position. I don't think you can have it both ways. I think in the Michigan statute, and in any statute, there's simply not a taser exception. The statute applies to all manufacturers, whether you're talking about drug manufacturers, whether you're talking about automobile manufacturers in Detroit. And simply, there cannot be a standard that a possibility of an injury requires a warning. There's also a serious problem with over-warnings. More than a possibility. You already had, in the pig studies, you had an example. And then you had the incident in the Faulkner case a year and months before that. You can't just say that's theoretical. There's no duty to warn based on a temporal association where there has never even been established any causation. I think that, and I do want to be sure I save time to talk about that. No, that death happened when? In March of 2008. So it's two years after the sale, but it's while there's still training going on. Correct. So I want to hit the over-warning point, but I want to be sure I have time to talk about the causation issue because that's an independent ground for affirmance here. Can I ask you a thing about training? So you have the statute, which they're codifying the rules for tort, and they're saying you can't use post-sale studies and so forth to figure out what the duties were pre-sale. So they're very clear about that. But then you have this other prong, which seems to be a little bit in tension. So how does this work, for example, with instructors? So you have TASER National Instructors, and we would say what they were teaching and what was warned about with respect to products was going to all be the same pre-06, whatever it was. But post-06, under Michigan law, TASER doesn't have new duties to warn as to previously sold products. But under Michigan law, would TASER have new duties based on later information when it comes to new training exercises? So in 09, they're suddenly training a new group of people, and it's TASER International people doing the training. Do they have a duty then to account for the state of medical knowledge? First, it's not TASER International people who are doing the training. We train master's instructors who are independent contractors who go out and train agency trainers who train their own officers, and TASER is never there. We have no control over whether they use our materials or don't use our materials in their training with their end-user officers, as happened here where they did not use our current training materials. They did not give the warnings to the officer at all, and that goes to the warnings causation issue that I want to be sure that we get a chance to cover. The TASER's training program, as admitted by plaintiff's own use-of-force expert, is a way to get the warnings and the instruction-for-use information to the officers. It, therefore, falls directly underneath the statute. Subsection 3 talks about not only a manufacturer's warnings but a manufacturer's instructions. And the program is used and is absolutely the protocol is set out in order to try to get those instructions for use and those warnings into the hands of the officers. And so it falls within the statute, and so it really is controlled by the point-of-sale situation. Plaintiffs did not argue in the district court and, therefore, have waived that there's some sort of separate, independent negligence claim for failure to train or inadequate training or whatnot. Everything to do with the training that was argued in the district court had to do with the failure to warn, and that's because their own expert says that's how TASER warns. That's how TASER gets the information to the officers. But I do want to... So we gave you a front on the other side. I wasn't really counting, but it's probably about 5, 10 minutes, so we'll let you go a little further. All right. Thank you, Your Honor. I do want to hit, because the judge had, of course, independent ground for granting summary judgment here. Either supports summary judgment. We think you should affirm on both. But certainly the lack-of-warnings causation piece of this is perhaps from a decision tree analysis the most direct way to affirmance. And it actually was our lead argument on the summary judgment motion below. The fact that Officer Lapham never saw TASER's version 13 PowerPoint presentation, which included these detailed instructions for use, and never read TASER's March 1 of 2007 product warnings that were in effect at the time that his own department certified him to use the X26 weapon, that's case dispositive on proximate cause. The case I cited to the court earlier, the Rodriguez case, addresses this issue head-on as well. And in that case, affirmed summary judgment for a product manufacturer finding there was no causation as a matter of law where there was no evidence that even if Stryker had placed a proposed warning in the pain pump instructions, that the warning would have ever reached the doctor. And that's exactly the situation that we have here. The Eighth Circuit's decision in the Bechtel case just last year held exactly the same thing in a TASER case. It really is on all fours with this one, and which plaintiff wholly ignored in their reply brief here. The Eighth Circuit in that case similarly said, because there was no evidence that the warnings would have ever made its way to the officer, and the officer was clear in the testimony, just like the officer here was clear in his testimony, he never saw the PowerPoint, he never saw the warnings. And not only that, but Officer Labham testified that in the two-year period of time between the date of his training and the date of Mr. Mitchell's death, that he never received any additional information from his department whatsoever that came from TASER. There were 15 training bulletins. You said he never saw the PowerPoint, he never saw the warnings. So you're saying that there were warnings? TASER has detailed warnings, Your Honor, that are in written form, that are several pages long, that in the PowerPoint presentation, there's a slide that says, are TASER devices risk-free? No. Hand out the warnings now, stop the course, and review these before you go on with the training course. But your answer to my question is yes, there were warnings. Yes, absolutely. And not only were there warnings, there were warnings about risks of death in the use of TASER's product in stressful field situations. Warnings that, frankly, the other circuit-level courts, including the Ninth Circuit in the Marquez case, have determined to be adequate as a matter of law in the same set of warnings that are at issue here to warn about risks of death in stressful situations in the field. One of these encounters is not stressful. It is stressful, Your Honor. The use of a TASER device, it's painful, it's stressful. No, I'm saying pre-use of the TASER, aren't all these encounters stressful? They certainly are, and arrest-related deaths existed before the TASER was ever introduced in the market for that reason. There's always a lot of things that come into play in this situation. TASER has always warned that it could be causative to a situation where you already have a metabolically compromised person, there's a lot of unknown pre-existing conditions that might exist, those types of things, that there are risks of death, or at least contribution in terms of the using of the TASER device. But that's not Plano's medical causation theory here. They focus in on direct electrically induced VF because that's the one thing TASER didn't give a direct warning about at this time. But there's simply no studies that support that. There are significant human studies that exist, Your Honor, that are human studies where they've never found cardiac capture in medically monitored situations in any human being. I think we've given you a chance to make your argument, so thank you very much. We greatly appreciate it. And Mr. Burton, you'll get your rebuttal time. Yes, thank you. Excuse me if I speak quickly. In fact, there is cardiac capture in a human being. It's the CAL study from 2007. There were simply a great many of assertions made in the last argument that are simply not correct. For example, we address at length the Bechtel case in the reply brief. But I want to focus on something that hasn't come up yet. Judge Sutton, you've referred several times to what was the state of knowledge at the time the sale was made. The delivery was in August. The articles were published in July, but TASER knew about them about six months before. They had been presented at a conference in April. There had been this death reported the prior year. But I wanted to go to it. Did they know about the second article in the same way? Both articles were in the same journal, published at the same time. Right, right. But they were published a week before the sale. No, they were published a month before the sale. They were published online. They post on something called PubMed. Hang in there. They had information about the study they funded six months before, because that's the conversation you referred to. Did they know about the results of the other study more than a month before the sale? Yes. Okay. Yes, because both authors, this was a big deal. They were working together, were you going to say? No, they actually worked independently, but they both presented at the April 2006 Heart Rhythm Society meeting. It was in Boston, I believe, that year. And they each presented their abstracts and their findings and attended each other. So when it came out in the issue that was dated August, but the study were actually put online, and we put the URL in our brief, in July. But it was known to have been coming from the conference in April. But I'd like to focus on, let's assume that this evidence did not amount to enough to justify a warning. That would make the fact that this device is lethal when shot, potentially lethal when shot in the chest, when given to officers as a nonlethal weapon, that is a latent defect. And if Taser found out about the latent defect after it had sold the product with this, according to their construction of the evidence, not according to ours, with this latent defect, then there is a post-sale duty to warn under Michigan law. That law is absolutely clear. Well, no, it's not that clear. I mean, the Michigan statute, this theory that post-sale evidence is relevant to the prior duty reads out of the Michigan statute this rule that, no, you assess material risk based on the evidence available at the time of sale. And so, I mean, we have to make those things work together. I definitely agree with that. We don't want to nullify either of them. But you must agree there's a little tension between the two. Well, we believe that Gregory and the other case are still good law. They've been cited since that statute was enacted. I'm sorry, it's Gregory and Comstock. Right, both hold that. And there's also Section 4 of the statute, which says nothing absolves the manufacturer from a continuing duty to exercise due care in relation to the project. That might cover a recall situation. You do the recall, now you have a duty of care. At the moment, two years later, you've fixed the break or whatever the problem is. I mean, I'm not saying that's the only way to read it, but don't we have to read 4 in a way that gives 3 meaning? Well, let me turn, because I know time is short. I hope I'm answering your question. I mean, I disagree. We briefed it. We think Comstock and Gregory remain good law. And if this were a latent defect, then that would impose a post-sale duty to warrant. But there is also this negligence program. The word latent is just another way of saying defect discovered after the sale. Exactly. That's what 3 is trying to get at. We think that 4 is what gets at that, which imposes this continuing duty. Second, we did not waive the negligence argument in the trial court. We made the negligence argument very explicitly. The training program is summarized very well in this district court opinion out of Virginia. It's called Russell v. Wright, where they talk about the master instructors, the certifications. One of the requirements of TASER is that before any training session, the trainers are to check the taser.com website 72 hours to get the latest information. And there are several false statements, or at least controverted statements, that were made regarding Officer Lapham's training. All of the warrant trainers got two days of training from TASER instructors using TASER materials. They instructed Officer Lapham, when he first joined the force in 2007, for a full day using the TASER material. He read material. He looked at papers. He practiced firing at targets. He then had updated training, and he testified to that. And there were no warnings that were new in regards to chest shots, given until September of 2009, which was five months after this incident. You've been very patient. I hope I've answered all of your questions. Well, both of you have been patient with us with our questions, and most importantly, we really appreciate your trying to answer them, which is always something we are grateful for. We don't always get that. So thanks so much to both of you. This is a really difficult case, and we really appreciate the excellent briefing and the excellent oral argument, and we're going to try to work our way through it. So thanks very much. Thank you, Your Honors. Thank you.